```
CAB4LANC

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     LANDESBANK BADEN-WURTTEMBERG
 3   SPENCERVIEW ASSET MANAGEMENT
     LIMITED, et al.,
 4              Plaintiffs,
            v.                             12CV5907(MGC)
 5   CAPITAL ONE FINANCIAL CORPORATION,
     et al.,
 6              Defendants.
     ------------------------------x
 7   LANDESBANK BADEN-WURTTEMBERG,
                Plaintiff,
 8          v.                             12CV5909(MGC)
     CAPITAL ONE FINANCIAL CORPORATION,
 9   et al.,
                Defendants.
10   ------------------------------x
     LANDESBANK BADEN-WURTTEMBERG
11   SPENCERVIEW ASSET MANAGEMENT
     LIMITED, et al.,
12              Plaintiffs,
            v.                             12CV5911(MGC)
13   BARCLAYS BANK PLC, et al.,
                Defendants.
14   ------------------------------x
                                           New York, N.Y.
15                                         October 11, 2012
                                           11:10 a.m.
16   Before:

17                  HON. MIRIAM GOLDMAN CEDARBAUM
                            District Judge
18
                              APPEARANCES
19   LABATON SUCHAROW
          Attorneys for Plaintiffs
20   DAVID J. GOLDSMITH

21   MURPHY & McGONIGLE
          Attorneys for Defendant Capital One
22   CAMERON MATHESON
     JAMES GOLDFARB
23
     SULLIVAN & CROMWELL
24        Attorneys for Defendant Barclays Bank
     BRIAN FRAWLEY
25   JOHN FRITSCH


              SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
```

1              (Case called)

2              THE COURT:  This is a motion for remand to the state

3    court, three related cases which were removed on the ground

4    that the claim is governed by a federal statute, the Edge Act,

5    and it is really the dispute over whether the Edge Act applies

6    to this case that brings you all here today.  The proponent of

7    the motion seeks remand on the ground that the Edge Act does

8    not apply to the transactions in this case.  The transaction is

9    not the sale of foreign stock, the stock of a foreign bank, but

10   by the sale of securities or the purchase of securities by a

11   foreign bank, which were not issued by the defendant which is a

12   national bank.

13             That is a very important matter depending on how you

14   interpret the Edge Act.  Words are not crystals and there are

15   many statutes that are not crystals.  So, I would like to hear

16   first from the proponent of the motion as to what precisely

17   precludes the application of the Edge Act.

18             MR. GOLDSMITH:  Thank you, your Honor.  The Edge Act

19   as your Honor indicated is not crystal clear.  It has very

20   broad language.  I think it could be read to confer this court

21   with jurisdiction potentially over almost any civil case where

22   a national bank is named as a party.

23             THE COURT:  But that can't be what it means.

24             MR. GOLDSMITH:  Precisely, even if there were any

25   foreign or territorial elements no matter how small.  Our

1   position, your Honor, is that the Edge Act which is a Great
2   Depression statute was meant to be part of a larger set of
3   statutes that regulated national banking activity.  The purpose
4   of the Edge Act as we understand it, your Honor, was to provide
5   a uniform federal common law if you will over national banks,
6   so that whereas these sorts of entities have a national
7   character, they are not incorporated in any individual state,
8   you would have a regime, your Honor, where U.S. district courts
9   would have jurisdiction so you would have uniform federal law
10  over banking activity.
11          Our position is that this case does not fit into that
12  rubric.  This is not a case about a banking arrangement.
13  Rather, it's a case about a packaging and selling of
14  securities.  It's true of course that our clients are foreign
15  entities, true of course that these certificates or securities
16  were sold to foreign investors but --
17          THE COURT:  They were not sold by a national bank,
18  were they.
19          MR. GOLDSMITH:  That's correct. The national bank at
20  issue here, Capital One NA, acquired Chevy Chase entities.
21          THE COURT:  Forgetting that, I am assuming for the
22  moment, I am focusing on whether Chevy Chase would have been,
23  if it still existed, would have been governed by the Edge Act,
24  because this is just a successor in interest.  Chevy Chase was
25  a national bank and its successor in interest is a national

Case 1:12-cv-05907-MGC   Document 21   Filed 10/24/12   Page 4 of 18    4
CAB4LANC

1   bank.  The question is whether the transaction that Chevy Chase
2   had some relationship to but what was not a direct participant
3   in comes within the Edge Act, isn't that right.
4           MR. GOLDSMITH:  That's correct, your Honor.  So Chevy
5   Chase was a federally registered --
6           THE COURT:  What I call a national bank.
7           MR. GOLDSMITH:  Indeed.  We can set that issue aside
8   for the moment.  These securities were packaged entirely
9   domestically by Chevy Chase with its affiliates, Chevy Chase
10  funding and the like.  Chevy Chase Bank was the sponsor of the
11  securitizations at issue and Chevy Chase --
12          THE COURT:  Exactly what was the role of Chevy Chase.
13  Chevy Chase was not the issuer, was not the seller, isn't that
14  right.
15          MR. GOLDSMITH:  I believe it was.
16          THE COURT:  It was actually the seller.
17          MR. GOLDSMITH:  I believe Chevy Chase Bank, FSB and
18  Chevy Chase Funding operated as issuers of the securities.
19  There is a complex set of transactions where loans, mortgage
20  loans are originated by whoever.
21          THE COURT:  I have many, many cases involving these
22  mortgage-backed securities of various kinds and the issuance of
23  certificates usually not for common stock but for preferred
24  stock certificates are more commonly backed by bad mortgages.
25          MR. GOLDSMITH:  Correct, your Honor, understood.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  chevy Chase entities setting aside Capital One were the issuers
2  of the securities at issue.  One question --
3              THE COURT:  Did they actually receive money in
4  exchange, that is, did the bank receive money from the foreign
5  entity.
6              MR. GOLDSMITH:  The underwriters of these securities,
7  your Honor, were not Chevy Chase entities; they were Barclays
8  with the U.S. underwriting arm called Barclays Capital Inc. and
9  Credit Suisse securities USA, both are the U.S. securities
10 underwriting arms of Barclays and Credit Suisse.
11             THE COURT:  They are both semi-foreign organizations.
12             MR. GOLDSMITH:  They are large U.S. entities which
13 have a global foreign parent only one of which is named as a
14 defendant in this case.  The purchase and sale transactions
15 were actually between either Barclays and our clients,
16 Landesbank and other entities, or Credit Suisse and our
17 clients.  They were not actually between Chevy Chase and the
18 foreign plaintiffs, because Chevy Chase as we understand it
19 would sell the securities to the underwriter and the
20 underwriter would market them to the public, including both
21 U.S. and foreign investors.
22             Our position is that the foreign status of plaintiffs
23 is really, to borrow the words of one of the cases we cite, is
24 really a question more of chance than of substance.  The
25 securities themselves have no foreign dimension.  That's in

1  distinction to other cases in this court relating to
2  residential mortgage-backed securities.  Many of the cases in
3  this court are issues where loans were originated by foreign
4  banks or territorial banks including Puerto Rican banks.
5          THE COURT:  Puerto Rican banks are not foreign.
6          MR. GOLDSMITH:  They are territorial and the Edge Act
7  covers the territories as well.  That's not at issue here.  In
8  the *AIG* case with Judge Jones which is discussed in the
9  briefing, your Honor, what happened there was a few of the
10 mortgage loans in the collateral pools were issued by I believe
11 Puerto Rican banks.  It was argued that that brought the Edge
12 Act into play.  Judge Jones found that it did.
13         THE COURT:  And the statute explicitly speaks of
14 territorial banks.
15         MR. GOLDSMITH:  It does.  Here what is important as a
16 distinction is that the pools are made up only of U.S. loans.
17 The reason why we submitted those thick offering materials was
18 to support that fact.  So, you have a U.S. securitization
19 packaging, a U.S. issuer, a U.S. originated mortgage loan, and
20 they sold them all over the world, to investors say down the
21 street perhaps and to my clients in Europe and Cayman Islands.
22         The question before the court is whether that's a
23 foreign banking transaction.  We would suggest, your Honor,
24 that it's really not a banking transaction within the letter of
25 the statute and it's not a foreign --

1    THE COURT:  You are saying the foreign bank was just
2 buying assets.
3    MR. GOLDSMITH:  Correct, your Honor.  There is no
4 lending arrangement between the plaintiff and the defendant,
5 there is no letter of credit, there is no revolving credit
6 facility.  You don't have any of those hallmarks of banking
7 which we believe the Edge Act was designed to address.
8    THE COURT:  Any commercial entity in Germany could
9 have done exactly what the Landesbank did is what is you are
10 saying.
11   MR. GOLDSMITH:  Yes, your Honor.
12   THE COURT:  Why is that not so.
13   MR. MATHESON:  Good morning, your Honor.  There are
14 two arguments plaintiff made.  One is that Capital One NA was
15 not sufficiently involved in this transaction.  Under the
16 National Bank Act, it is indistinguishable --
17   THE COURT:  It's not the American entity that has to
18 be sufficiently involved, it's the foreign entity that has to
19 be sufficiently involved, isn't that right.  We are talking
20 about foreign transactions, not American transactions.
21   MR. MATHESON:  Correct.
22   THE COURT:  That's what the Edge Act is talking about,
23 foreign banking transactions.
24   MR. MATHESON:  It's broader than that.
25   THE COURT:  What is the language, financial.

1          MR. MATHESON:  International or foreign financial
2     operations.  It does not require banking.
3          THE COURT:  Again, the focus there is on the foreign
4     bank not on the American bank.
5          MR. MATHESON:  No, but it requires there be an
6     international financial transaction that nowhere in the act
7     does it require a foreign bank be involved.
8          THE COURT:  Purchased by a foreign entity, any
9     purchase by a foreign entity is an international transaction.
10    It can't be that every international transaction, if a national
11    bank happens to be in any way a participant in that, becomes
12    subject to the Edge Act.  There has to be some more important
13    foreign aspect.
14         MR. MATHESON:  What this case involved is a sale by a
15    U.S. national bank of securities to a German bank.
16         THE COURT:  Did the bank sell them.
17         MR. MATHESON:  The way this transaction was
18    structured, yes, Chevy Chase Bank is the seller.
19         THE COURT:  But it was not stock of the bank --
20         MR. MATHESON:  No.
21         THE COURT:  -- that was being sold.
22         MR. MATHESON:  Correct it was not.
23         THE COURT:  Nor was it a sale by a foreign bank of
24    stock of its.  The foreign bank was buying an American security
25    essentially, is that right.

1           MR. MATHESON:  That's correct, they were buying
2    mortgage-backed bonds.  Your Honor in the *Racepoint* case upheld
3    jurisdiction under the Edge Act in a case involving the sale of
4    securities by a U.S. bank.
5           THE COURT:  That's true but if you recall what I said
6    was it was because the transaction was in euros.
7           MR. MATHESON:  I don't believe that the Edge Act
8    requires that the transaction be in a foreign currency in order
9    for it to be international in character.
10          THE COURT:  It has to have some aspect that's foreign
11   that has some significance and the use of foreign currency is
12   one such possibility.  This was a deal which could have been an
13   American deal.  The buyer just happened to be a foreign bank.
14   If the foreign bank had sold its own stock, it would arguably
15   be more of a true international transaction.  It's very hard to
16   read the Edge Act as applying to any kind of purchase by a
17   foreigner of American securities.
18          MR. MATHESON:  What the Edge Act covers is
19   transactions that involve United States national banks or any
20   corporation organized under the laws of the United States when
21   they are engaging in international transactions.  This is a
22   transaction involving multiple countries.
23          THE COURT:  That goes on every day in American
24   dollars.  Very rarely does anybody claim that the Edge Act
25   applies, because this is not a sale of stock of the bank or of

1   the foreign bank; this is an ordinary commercial transaction.
2             MR. MATHESON:  That's all the Edge Act requires.
3   There is no language in there to suggest the transaction has to
4   be a particular, has to be of stock of the bank.
5             THE COURT:  What do you contend was the purpose of the
6   Edge Act.
7             MR. MATHESON:  Well, I agree that the purpose of the
8   Edge Act was to have uniform law involving transactions with
9   national banks.  That's exactly what this is.  This was an
10  international transaction.
11            THE COURT:  It can't be all transactions.
12            MR. MATHESON:  It has to be an international
13  transaction or a foreign transaction or a banking transaction
14  involving, that has an international character to it.
15            THE COURT:  But the only international character here
16  is the fact that the customer was a foreign bank.
17            MR. MATHESON:  It's more than that.
18            THE COURT:  It could have been an individual German
19  citizen.
20            MR. MATHESON:  Correct.
21            THE COURT:  Is it your position that the Edge Act
22  would apply then.
23            MR. MATHESON:  Yes.
24            THE COURT:  It would apply to a purchase by a German
25  citizen of these mortgage-backed securities.

1              MR. MATHESON:  Correct.

2              THE COURT:  Do you have any case in which the Edge Act
3     was applied to a situation in which it was an ordinary German
4     citizen who bought this stock.  I have not seen one.

5              MR. MATHESON:  Off the top of my head I cannot think
6     of one; however, none of the cases have indicated that it is
7     important who is on the other end of the transaction.

8              THE COURT:  They didn't involve the issue.  All of
9     these cases are very different.

10             MR. MATHESON:  Yes.

11             THE COURT:  I have yet to see a case in which if a
12    foreign commercial entity buys the same stock, the Edge Act
13    applies, yet the national bank is just as involved, as in this
14    case, which is not very much.

15             MR. MATHESON:  Under the Edge Act the case has to
16    arise from the transaction.  If we had a situation where Chevy
17    Chase had sold the securities to American investors and foreign
18    investors and it was the American investors who were suing, the
19    Edge Act clearly wouldn't apply.

20             THE COURT:  That's right, but I want to know what
21    happens if a foreign entity sues.

22             MR. MATHESON:  Then the Edge Act clearly applies.

23             THE COURT:  You think that makes sense.

24             MR. MATHESON:  Yes, I do.  It's consistent with the
25    language of the act and provides for uniformity.

1          THE COURT:  It's not a question of what's consistent.
2    The question is why does Congress care which foreign entity it
3    is that is doing this transaction if it's not a banking
4    transaction and it's not a transaction in foreign currency.
5    This is a straight transaction in American dollars in which the
6    buyer happens to be, instead of being a manufacturing company,
7    a bank.
8          MR. MATHESON:  I think the answer is Congress doesn't
9    care who is on the other end of the transaction.  What Congress
10   cares about is that a national bank is on one end of the
11   transaction and the transaction is foreign or international.
12   That's what the language of the act says.  There is nothing in
13   there about with whom the bank is doing the transaction.  The
14   key is that it's a U.S., it's a national bank on one end of
15   that transaction and that that transaction is international in
16   character, which is what we have here.  The Edge Act has no
17   other requirement written into it that the plaintiffs are
18   trying to read one in.
19         THE COURT:  Is there a legislative report by the
20   sponsor of the act at the time it was enacted.
21         MR. MATHESON:  I have not studied the legislative
22   history of the act.
23         THE COURT:  I would be very much interested.  I don't
24   think it's by accident that we don't have any case that
25   suggests as you do that any foreigner purchasing through a

1    transaction, not actually from, through a transaction in which
2    an American national bank was involved is sufficient to invoke
3    the Edge Act.  I would like both sides here to take a look at
4    what Congress thought it was doing when it enacted this
5    statute.
6             MR. MATHESON:  I think the reason, your Honor, you are
7    not seeing those cases, typically those are brought under the
8    Federal Securities Act.
9             THE COURT:  That's right.  That's right.  If the same
10   thing applies --
11            MR. MATHESON:  The Federal Securities Act, the reason
12   they have not brought a Federal Securities Act here is because
13   it was would be time-barred.  That's why they are bringing a
14   claim for common law fraud; it's solely about the statute of
15   limitations.
16            THE COURT:  That may be but Congress may not want to
17   preserve this suit.  It may not have been concerned about
18   extending the statute of limitations.
19            MR. MATHESON:  What they are concerned about is a
20   federal forum for cases that involve this type of transaction.
21            THE COURT:  This could have been brought under the
22   securities law.
23            MR. MATHESON:  Not anymore.
24            THE COURT:  Originally if it were timely, yes, so why
25   would Congress be interested in extending the statute of

1    limitations on such a transaction.

2            MR. MATHESON:  I don't think that's what they are

3    doing.  The Federal Securities Act --

4            THE COURT:  That's the effect.

5            MR. MATHESON:  The Federal Securities Act explicitly

6    says that it doesn't override the statute of limitations for

7    state causes of action.  They are bringing a claim under common

8    law fraud.  What Congress was interested in is providing a

9    federal forum for sales involving securities and also for

10   international actions involving national banks.

11           THE COURT:  I would really like to be a little clearer

12   on just what the purpose of the Edge Act was because this is a

13   very common kind of transaction which has no connection with

14   banking at either end.

15           MR. MATHESON:  I would disagree.

16           THE COURT:  It's not a foreign banking transaction;

17   it's a transaction by a foreign bank.  It's quite a difference.

18           MR. MATHESON:  It's a transaction for a U.S. bank to

19   raise capital and it's a transaction of a foreign bank to

20   invest.

21           THE COURT:  It's not for a U.S. bank to raise capital.

22   That's not so.

23           MR. MATHESON:  There are ways other than a bank

24   selling its own securities to raise funds.

25           THE COURT:  I understand, but how was this to raise

1   capital for a national bank.

2             MR. MATHESON:  They were selling securities to receive
3   the proceeds.

4             THE COURT:  It's a question of exactly how it was
5   structured.  But that doesn't make it international, the fact
6   that an American bank was selling securities.  What makes it
7   international is a foreign customer and if the foreign customer
8   is not seeking capital, it's not crystal clear that Congress
9   cares where the suit is brought.

10            MR. MATHESON:  I don't think Congress cares who is on
11  the other side of the transaction or what their purpose is in
12  doing the transaction.  What they care about is that on one
13  side of the transaction is a national bank.  In *Stamm v.*
14  *Barclays*, there was a situation very similar to this involving
15  sale of securities and the court ruled that the sale of
16  securities is a financial operation.

17            THE COURT:  I understand.  There is very big split of
18  the authority as you know.  This particular set of facts has
19  not really been examined.  But that's neither here nor there.
20  I would like both sides to see if you can find actual
21  legislative history that would either support what you are
22  saying or raise a slight difference in the purpose as to what
23  Congress really meant by an international banking transaction.

24            MR. MATHESON:  Again, it's much broader than just
25  banking; it is not limited to banking.

1                THE COURT:  There are two pieces.  What are the words.

2                MR. MATHESON:  The language is --

3                THE COURT:  There are two clauses.

4                MR. MATHESON:  Arising out of transactions involving
5    international or foreign banking.

6                THE COURT:  This is not foreign banking.

7                MR. MATHESON:  Correct, and we are not claiming that
8    it is, your Honor, or banking at a dependency or insular
9    possession of the United States or out of other international
10   or foreign financial operations.

11               THE COURT:  Operations doesn't usually mean the same
12   thing as transactions.

13               MR. MATHESON:  Right.  It's a transaction arising out
14   of foreign financial operations.  Multiple courts have held --

15               THE COURT:  Here it arose out of American financial
16   transactions not foreign transactions.  It was purchased by a
17   foreign bank but it was not a foreign banking transaction or an
18   international transaction except in terms of the sale.  A sale
19   is not an operation.

20               MR. MATHESON:  It was certainly an international
21   financial transaction.

22               THE COURT:  That's the language you just read me; I
23   thought it was international financial operation.

24               MR. MATHESON:  That's correct.

25               THE COURT:  Not transaction but operation, which is a

1    different word.

2           MR. MATHESON:  Transactions arising out of.

3           THE COURT:  Fine, out of international operations.
4    What was the international operation here.

5           MR. MATHESON:  It was the sale of securities to
6    foreign investors.

7           THE COURT:  Then you are just removing the word
8    operations from the statute.

9           MR. MATHESON:  I would disagree.  Multiple courts have
10   held that the sale of securities is a financial operation.

11          THE COURT:  Some have; some haven't.

12          MR. MATHESON:  I believe, your Honor, you did, in
13   *Racepoint*.

14          THE COURT:  That's right, but it was very important to
15   me that it was the operation of foreign currency.  I made a
16   point that that was the only thing that I thought brought it
17   under the Edge Act.  We don't have that here.

18          MR. MATHESON:  That was the foreign aspect of the
19   transaction.

20          THE COURT:  This is an entirely American dollar
21   transaction.

22          MR. MATHESON:  Yes, it is.

23          THE COURT:  I would like both sides to give me what
24   you find of the legislative history.

25          MR. GOLDFARB:  Just as a matter of administration,

CAB4LANC

1    would it helpful for your Honor if both sides simultaneously
2    submitted a two-page or three-page letter brief.
3            THE COURT:  That's fine.
4            MR. GOLDFARB:  In a particular timeframe.
5            THE COURT:  As soon as you can.  How much time do you
6    need.
7            MR. GOLDSMITH:  We will work it out.
8            THE COURT:  I would like to know how much; you don't
9    need more than a week to examine the legislative history.
10           MR. GOLDFARB:  No, your Honor.
11           MR. GOLDSMITH:  That's fine.
12           MR. GOLDFARB:  Can those be electronically filed or
13   delivered to chambers, your Honor.
14           THE COURT:  If you do it in the form of a brief, but I
15   like hard copies.  I am an old lady.
16           MR. GOLDSMITH:  We will deliver courtesy copies.
17           THE COURT:  Good.  I am very interested to see because
18   the Edge Act has been variously interpreted over the years
19   without a clear understanding of its purpose.  Nobody has
20   really examined its purpose that I have found, and because of
21   the vagueness of the language, it would help me a lot to
22   understand what Congress' concern was.  Very well.
23           I reserve decision.
24                            - - -
25